678 A.2d 594

**HUB LABELS, INC., et al.**

v.

**Alvin A. CRAIG, III.**

**No. 1548, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

June 28, 1996.

George W. Elder (Law Offices of Joseph M. Jagielski, on the brief), Baltimore, for Appellants.

Thomas W. Wetterer (Gregory C. Bannon, on the brief), Hagerstown, for Appellee.

Argued before MOYLAN, BISHOP and EYLER, JJ.

MOYLAN, Judge.

Is an appearance of Halley's Comet "unusual"? Or is it "routine"? And, most significantly, who is to say? Is it one thing, perhaps, to a frightened herdsman gazing into a strangely unfamiliar sky? Is it another, perhaps, to a blasé astronomer dutifully logging the thirty-ninth scheduled reappearance since the first recorded sighting from a ziggurat in Babylon? Superimpose jurisprudence on philosophy and the inquiry may become, "Is the quality of the unusual, like that of beauty, a question of fact or a question of law?" Is the eye of the pertinent beholder, moreover, the eye of the astronomer or the eye of the herdsman—the eye of a judge or the eye of a juror? It is a seemingly simple little case that prompts such unsimple musings.

The appellee, Alvin A. Craig, III, began working in 1989 for the appellant, Hub Labels, Inc., as a press operator. He suffered a back injury on December 14, 1992, while operating his printing machine and loading it with a roll of labels. He filed a claim with the Workers' Compensation Commission, alleging that he had suffered an accidental injury in the course of his employment. In unilluminating and purely conclusory terms, the Commission denied the claim, finding that Craig had not "sustain[ed] an accidental personal injury arising out of and in the course of employment."

Craig appealed to the Circuit Court for Washington County, where a jury, presided over by Judge Fred C. Wright, III, returned a verdict in his favor. On this appeal to us from that judgment, Hub raises two closely related contentions:

1. That Judge Wright erroneously failed to grant a Motion for Judgment, pursuant to Rule 2–519, in its favor at the close of all the evidence; and

2. That Judge Wright erroneously failed to grant a Motion for Summary Judgment, pursuant to Rule 2–501, in its favor prior to the commencement of the trial.

In its first contention, Hub argues that Judge Wright should not have allowed the case to go to the jury because there was no legally sufficient evidence to show that the undisputed injury to Craig's back was an *"accidental* personal injury,"* as that term of art is used in Workers' Compensation law. Hub's point of departure in that regard is *Lettering v. Guy,* 321 Md. 305, 582 A.2d 996 (1990):

> In this State . . . the failure of some essential function of the body is held to be accidental injury *only* when it results from *some unusual strain* or exertion of the employee or *some unusual condition* in the employment.

321 Md. at 309, 582 A.2d 996 (quoting from *Kelly–Springfield Tire Co. v. Daniels,* 199 Md. 156, 161, 85 A.2d 795, 797–98 (1952) Emphasis supplied). In *Kelly–Springfield,* Judge Delaplaine had surveyed the interpretations of the Worker's Compensation Act in a number of states and had found that most

were very liberal in their interpretation of what qualifies as an accidental injury:

It has been held by the great weight of authority that sudden and unexpected rupture of some portion of the internal structure of the body, as cerebral hemorrhage or apoplexy, or the *failure of some essential function of the body,* as heart failure or paralysis, brought about by the exertion of the employee while engaged in the performance of his duties, or by the conditions of the employment, *even without any external happening of an accidental nature, is an accidental injury.*

199 Md. at 159, 85 A.2d 795 (Emphasis supplied). Maryland, Judge Delaplaine pointed out, has been, by way of contrast, far stingier in its interpretation of "accidental injury":

*This broad rule,* which has been adopted quite generally in the United States following the decisions in England, *has not been fully accepted in Maryland.*

199 Md. at 161, 85 A.2d 795 (Emphasis supplied). The decisive test in Maryland, rather, has been whether the injury-triggering occupational demand placed on the employee was in some way "unusual":

In considering whether claimant's injury ... was accidental, the decisive test is whether it was caused by *any unusual strain or exertion* or *any unusual condition in his employment.*

199 Md. at 162, 85 A.2d 795 (Emphasis supplied). See also *Courtney v. Board of Trustees,* 285 Md. 356, 363, 402 A.2d 885, 889 (1979); *Stancliff v. H.B. Davis Co.,* 208 Md. 191, 198–99, 117 A.2d 577 (1955).

The phenomenon that must be found to be "unusual," moreover, is not the bottom-line traumatic *effect* but, rather, the occupational *cause* behind that effect. The point was well articulated in *Bethlehem Steel Co. v. Golombieski,* 231 Md. 124, 129, 188 A.2d 923, 926 (1963):

In *Vaughan v. Mayor & City Council of Baltimore,* 229 Md. 547, 184 A.2d 842 (1962), we recently pointed out (as we had on prior occasions) that *in Maryland the term "acci-*

*dental injury" does not include unexpected results not produced by accidental causes* and that this Court has consistently held that in order for an injury to be accidental and therefore compensable it must result from some *unusual* exertion or strain or some *unusual* condition in the employment. [Emphasis supplied.]

As a press operator for Hub, Craig regularly was required to lift and to load rolls of labels onto his press. Most of the time, he was required to load rolls that were 5,000 feet in length and weighed between thirty and seventy pounds. Occasionally, he was required to load rolls that were 10,000 feet in length and weighed approximately 150 pounds. The 10,000 foot rolls, moreover, were not only substantially heavier than the 5,000 foot rolls but were also bulkier and more awkward. It was while lifting a 10,000 foot roll that Craig injured his back.

Implicitly, the jury found that the occasions when the heavier lifting was required were infrequent enough to permit it to find, as it did, that such required lifting was "unusual" and that the injury, therefore, was accidental. Hub argues, however, that the heavy lifting was so frequent that it should have compelled the finding, as a matter of law, that it was "usual" and that Judge Wright should for that reason have granted judgment in favor of Hub rather than have submitted the case to the uncertainties of a jury verdict.

It is undisputed that Craig injured his back on the job. It is undisputed that the injury resulted from his exertion in lifting one of the 10,000-foot rolls. Everything turns on whether such heavy lifting was a "usual" incident of his employment or an "unusual" one. Also involved, of course, is the institutional issue of which arm of the judicial branch is properly entrusted with the resolution of such a question.

Our journey of exploration into the realm of the "unusual" must, at least in this case, proceed on two levels. There is first the abstract question of whether, assuming the numbers are firm and the frequency of strenuous occupational exertions per period of time has been established with precision, such a

frequency *may* or *must* be characterized as "usual" or "unusual." There is then the more pedestrian question of what did the evidence in this case establish as the actual occupational frequency which we are called upon to assign either to the fact finder or to the legal referee for dispositive characterization.

We look first to the more abstract question of respective adjudicative responsibilities. On the bell curve of occupational frequency, the two extremes are the zones wherein the judge is king. He may rule, at one end of the curve, that a very low occupational frequency made an injury-causing exertion "unusual," as a matter of law. He may rule, at the opposite end of the curve, that a very high occupational frequency made an injury-causing exertion "usual," as a matter of law. The broad middle of the bell curve, however, is the zone wherein the fact finder is king. With respect to the more ambiguous or problematic occupational frequencies, the fact finder is free to determine that an injury-causing exertion was "usual" or "unusual," as a matter of fact.

We direct attention to the very high occupational frequency end of the bell curve. If, in the course of a working month, an employee lifts a 50–pound box a thousand times uneventfully but then, on the one thousand and first occasion, suffers a herniated disc from lifting, he will not have sustained an accidental injury within the contemplation of Maryland's Workers' Compensation law. For the disc to rupture on that particular occasion will have been unusual, to be sure, but that kind of "unusualness" will not pass Workers' Compensation muster. The controlling criterion will be that, in the context of that employee's job, the exertion required to lift a 50–pound box was not "unusual" but "usual," and the judge will be required so to rule, as a matter of law.

We have found no appellate decisions holding that the occupational frequency of a particular task or exertion was so high that a judge would be compelled to rule, as a matter of law, that it was "usual." Hub urges on us the two cases of *City of Baltimore v. Jakelski,* 45 Md.App. 7, 410 A.2d 1116 (1980) and *Vaughan v. Mayor of Baltimore,* 229 Md. 547, 184

A.2d 842 (1962). Neither case stands for the proposition for which it is urged.

*Jakelski* dealt with a Baltimore City policeman who was scheduled to appear in traffic court once a month to testify with respect to traffic citations he had issued. On one occasion, he was involved in a traffic accident while en route from his home to the traffic court. The issue before this Court was whether he was injured in the course of his employment so as to entitle him to Workers' Compensation benefits or whether he was exempted from coverage because of the so-called "going and coming" rule. We cannot strain out of that case an analogy to this one.

The case of *Vaughan v. Mayor* is of no help at all to Hub. A Baltimore City firefighter injured himself while shoveling snow. The Board of Trustees of the Employees' Retirement System found as a matter of fact that the periodic shoveling of snow was "one of the usual duties of a firefighter." The Baltimore City trial judge found that the administrative action taken by the Board was "supported by evidence and not arbitrary, capricious or unreasonable." 229 Md. at 549, 184 A.2d 842. The Court of Appeals affirmed the trial judge, holding:

> The decision of the Board of Trustees was supported by evidence and was not arbitrary, capricious, unreasonable or illegal. The lower court did not err in dismissing the petition for mandamus.

229 Md. at 551, 184 A.2d 842. The fact that the occupational frequency of the snow shoveling was enough to *permit* a finding of fact that such a task or exertion was usual by no means implies that such a frequency would *compel* such a finding as a matter of law. The issue of "usualness" in that case was one for the fact finder and not, as Hub urges in this case, one that should have been taken away from the fact finder.

We now turn our attention to the opposite end of the bell curve where a very low occupational frequency will require a judge to rule, as a matter of law, that a particular task or

exertion was an "unusual" incident of employment. If an employee lifts a 50–pound box a thousand times uneventfully but suffers a herniated disc when, on a single occasion, he lifts a 500–pound box, the evidence will compel a legal ruling that the heavy lifting was "unusual" and that the employee sustained an accidental injury. The only appellate decision in this state dealing with the issue of occupational frequency is one that held that a particularly onerous occupational duty that arose on an annual basis compelled a ruling, as a matter of law, that it was "unusual" and that the injury resulting from it was an accidental injury within the contemplation of Workers' Compensation law. That was the case of *Sargent v. Board of Educ. of Balto. Co.*, 49 Md.App. 577, 433 A.2d 1209 (1981).

In that case, Judge (now Chief Judge) Wilner pointed to two factors that are pertinent to the question of whether a particular injury-causing task is "normal" or is "unusual." The second of those factors is the frequency with which the task occurs:

> In judging whether a particular task is a "normal incident" of the employee's work (or, conversely, whether an injury resulted from an "unusual condition" or "unusual strain or exertion"), we must consider two factors: (1) the nature of the particular task in comparison to the other duties required of the employee, and (2) *the relative frequency with which the particular task is required to be performed* in comparison to the other incidents of the job.

49 Md.App. at 582, 433 A.2d 1209 (Emphasis supplied). In then holding that the particularly onerous cleaning of a boiler that was required on an annual basis was sufficiently unusual to be "unusual" as a matter of law, the *Sargent* opinion contrasted that *annual* duty with more routine duties that are of a *daily* nature:

> The cleaning of the boiler was an extreme departure from appellant's routine duties and required much more physical

and mental exertion than *that to which she was accustomed on a daily basis.*

49 Md.App. at 583, 433 A.2d 1209 (Emphasis supplied).

Indeed, in discussing generally the fact that there is very little law on the subject of what is "unusual" and even less law on the sub-issue of the occupational frequency of a particular condition or exertion as a sub-factor, Judge Wilner twice employs the concept of a "daily" task as a paradigm for the "usual":

> There have been no generic definitions of what constitutes an unusual condition of employment or an unusual strain or exertion; those criteria have been defined more or less on a case-by-case basis, with the court, in each instance looking to the nature of the employee's routine duties, the normal conditions of employment, and the usual mental and physical demands placed upon the employee at work.

> The common denominator, if there is one, is whether, in the course of the activity leading to the accident the employee had departed from the normal routine of his job or whether the job conditions being performed *departed from the normality to which the employee was accustomed on a daily basis. . . .* In other words, if an injury is sustained while the employee is *performing daily, routine duties,* the injury has *not* resulted from an unusual condition of employment or an unusual strain or exertion and is, therefore, not accidental.

49 Md.App. at 581–82, 433 A.2d 1209 (Emphasis supplied; footnote and citation omitted; last emphasis in original).

■ Between the high occupational frequency extreme, as yet not occupied by a single reported decision, and the low occupational frequency extreme, occupied only by *Sargent,* there is a vast expanse of unfenced middle ground whereon the fact finder still ranges freely. It is still the fact finder who will resolve the question of whether the injury-causing exertion required to lift a 500–pound box is sufficiently "unusual" to make an injury accidental if the employee, albeit lifting 50–pound boxes 250 times per week, is called on to lift a

500–pound box three times a week—or three times a month—or three times a year.[1] As a guide to the fact finder, the *Sargent* opinion also makes it clear that the mere inclusion of a particular task within a job description is not determinative of whether that task is routine or unusual. The relevant criterion is not the job description but occupational frequency:

> The mere inclusion of the boiler cleaning duty within appellant's overall job description is not determinative of whether an injury sustained is compensable. *The relevant criterion, as we have noted, is whether the duty is routinely performed or performed with enough frequency so as not to constitute unusual work.* This Court would be setting dangerous precedent if we were to hold that any duty included within a job description is routine and usual, regardless of its nature or frequency of performance. That would be an open invitation to subversion of the Workmen's Compensation Law, which is to be liberally construed; and we decline to extend such an invitation.

49 Md.App. at 583, 433 A.2d 1209 (Emphasis supplied).

■ Before turning our attention to the second level of exploration in this case—that of the hard numbers or occupational frequency which we are required to accept by virtue of the particular appellate posture of this case—we do not hesi-

---

1. In the example we have been using, we have deliberately made the difference between lifting a 50–pound box and lifting a 500–pound box an extreme difference so as not to compromise, even inadvertently, the second criterion set out by *Sargent*, 49 Md.App. at 582, 433 A.2d 1209, for assessing whether an injury-causing occupational task is sufficiently unusual to qualify the injury as accidental. It is, of course, not only required that we look at, as we are doing in this case, "the relative frequency with which the particular task is required to be performed in comparison to the other incidents of the job." *Id.* It is also required that we examine "the nature of the particular task in comparison to the other duties required of the employee." *Id.* The *nature* of the injury-producing task might involve an unusually high degree of exertion compared to that required by more routine duties, or, as in the *Sargent* case itself, unusually stressful circumstances or conditions under which the task in question had to be performed. In the case now before us, however, the unusual nature or degree of exertion of the heavy lifting is not in dispute. The only question is whether the required lifting was sufficiently infrequent to qualify as "unusual" in that regard.

tate to conclude, as an alternative holding, that whatever occupational frequency could be inferred from the evidence in this case, even that most favorable to Hub, we would not fault the decision of Judge Wright to submit the case to the jury. Believing that the territory of the fact finder is not a narrow strip between the forty yard lines but the broad expanse between the end zones, we necessarily believe that the question of whether the heavy lifting that caused the injury to Craig's back in this case was "usual" or "unusual" was a matter of fact properly entrusted to the fact finder. Judge Wright was, therefore, not in error in submitting the case to the jury.

■ *A fortiori*, Judge Wright was not in error when we look, as we must, at the evidence of the occupational frequency of the heavy lifting in the light most favorable to Craig. The playing field between Craig and Hub is, as of this appeal, no longer level. It was Craig who prevailed before the jury and it is his position, therefore, that now enjoys the presumption of correctness. As the appellate challenger, it is Hub that must struggle uphill.

■ The evidence as to the frequency of the heavy lifting came from a single witness, Craig himself, and it was, moreover, relatively skimpy. Our appellate assessment of whether it was sufficient to take the case first to trial and then to the jury is a textbook example of what a difference it makes whether a limited testimonial specimen is viewed 1) through a lens that magnifies, 2) through a lens that miniaturizes, or 3) without any distorting refraction whatsoever. In both appellate brief and appellate argument, the phrase that has been freely bandied about, in an effort to quantify the frequency of the heavy lifting, is "once or twice a week." Whether that phrase accurately reflected the actual testimony and whether it has any significance for our present analysis are matters that we will consider further hereinafter. For the moment, however, the phrase "once or twice a week" serves to provide a helpful illustration of how a single evidentiary factoid may

wax or wane dramatically as we view it from different perspectives.

Let us, purely for illustrative purposes, take the frequency of "once or twice a week" as a given. Looking at it only in a literal or mathematical sense, before adding to it any verbal or semantic overlay, what does "once or twice a week" mean in a court of law? To a fact-finding juror, it may mean anything from 52 times a year up to and including 104 times a year. Submit the question to 100 fact-finding juries and the mean response will come out to be approximately 78 times per year.

The same phrase, "once or twice a week," will, by way of contrast, mean very different things to a trial judge called upon to grant a Motion for Judgment or to an appellate court called upon to review the trial judge's action in that regard. What the phrase "once or twice a week" means, as a matter of law, also depends on who was the non-moving party and who, therefore, is entitled to the most favorable possible version of the evidence. Had Hub prevailed below and were Craig the moving party, "once or twice a week" would mean nothing less than 104 times per year or 312 times over the three-year course of employment involved in this case. That version of the frequency, most favorable to Hub, might, were it properly before us, at least be getting close to the point where it might be held that the occupational exertion was "usual," as a matter of law, and the injury, therefore, was not accidental.

In this case, of course, it was Craig who was the non-moving and ultimately prevailing party. It is he, therefore, who is entitled to the most favorable possible version of the evidence. Viewed through the miniaturizing lens, "once or twice a week" means no more than fifty-two times per year. That presents a very different picture.

Thus far, moreover, we have been looking at the phrase "once or twice a week" in a literal or mathematical sense. As a verbal or semantic reality, the phrase lacks such precision. It is, far more likely, a rough approximation. It may have been said with a shrug, with a quizzical raising of the eyes to the ceiling, or with a sigh of resignation at the end of an

exasperating cross-examination. The jury, of course, had the benefit of such non-verbal communication which is not reflected in a typewritten transcript. The phrase may, with such real-world coloration, mean significantly less than fifty-two times per year or significantly more than 104 times per year. In this particular case, it is Craig who is entitled to the view through the miniaturizing lens.

Ironically, Hub, both in brief and oral argument, so skillfully hammered out the repetitive, Goebbels-like drumbeat of "twice a week," "100 times a year," "300 times in three years," that we found ourselves, as we began to consider this appeal, almost beguiled into looking at the evidence through the wrong or magnifying lens. In the appellate posture of this case, however, where it is Craig who is entitled to that version of the evidence most favorable to him, the quantitative characterization of "twice a week" does not exist and may not, therefore, enter into our calculations.

As we move from the hypothetical illustration to the actual evidence, however, the view gets even better from Craig's perspective. Although Hub tries heroically to excise the adverb "maybe" from the transcript, its evidentiary high water mark of "once or twice a week" nonetheless degenerates into nothing better than "*maybe* once or twice a week." From Hub's point of view, what a falling off there is there. Craig's testimony as to the frequency with which he was required to do the heavy lifting was far, far less precise than Hub would have us believe. Craig was the only witness to testify before the Washington County jury and his direct examination, with respect to the frequency of the heavy lifting, was as follows:

Q: And what size roll of paper did your press machine usually use?

A: Five thousand foot.

----

Q: How often would you lift a five thousand foot roll of paper on your job at Hub Labels?

A: I'd say probably ninety percent of the time.

Q: And how often would you have the occasion to lift the ten thousand foot roll of paper?

A: *It would be rare occasions.* It depended on what the envelope [containing the job order] stated. If they had the paper for the job or the die could have called for smaller paper, but they only ordered ... well the press was a seven inch press so it could only take paper up to seven inches. So a lot of times they ordered wider paper which made the ten thousand foot rolls bulkier. But *it would depend on the job, the envelope and what it called for.* [Emphasis supplied].

What the cross-examination of Craig revealed was an untutored layman steadfastly trying to maintain his position that he could not quantify the frequency of the heavy lifting with any precision, even as the cross-examiner bombarded him with leading questions attempting to wring out some more precise acknowledgement:

Q: And you said that you did in fact run these then thousand foot rolls of paper, is that correct?

A: *On occasions.*

Q: Okay. And how may times would you say a week you ran the ten thousand foot rolls?

A: *That would depend on what the envelope required on the job.*

Q: Okay. Tell me how many times you ran that size roll.

A: *It would depend on the job, really what they had in paper stock.*

Q: Okay. Isn't it a fact that you ran this size roll once or twice a week since you were operating the machine?

A: *That would depend on the envelope and the job.*

Q: I understand. You follow orders and you do what the orders tell you to do. And my question to you is isn't it a fact that either once or twice a week you would run that size roll of paper?

A: *Maybe.* I'm going back to the same thing. Like it might be ...

Q: I'm sorry?

A: *I said maybe.*

Q: Maybe? Do you remember testifying at the Workers' Compensation Commission on April 13th, 1994?

A: Yes I do.

----

Q: Do you remember me asking you this question? "Mr. Craig you've just testified you lifted this ten thousand foot size roll before on occasion, is that correct?" Would you mind reading you answer there?

A: "Yes."

Q: And then I asked you, "Okay. And how many occasions would that have been?"

And then you responded to that question by saying?

A: "During what time?"

Q: And then I asked you, "The whole time you were working there."

And you responded how is that?

A: *"I couldn't give you the specific ... "*

Q: And then I asked you, "Can you estimate?"

And your reply was?

A: "Weekly or the whole ... "

Q: And then I said, "Whichever way you want to do it, weekly, daily."

Your response was?

A: *"I don't know. Maybe once or twice a week."* [Emphasis supplied].

In characterizing the testimony, Hub conveniently forgets the "maybe" just as it conveniently forgets the "I don't know" that precedes the "maybe." If we were permitted to take the evidence in the light most favorable to Hub, "maybe once or twice a week" might have potential significance in establishing that the heavy lifting was not unusual. We may not, however,

take the evidence in that light. In the very different light more favorable to Craig, "maybe" could be taken simply to mean "maybe or maybe not." In the context of the entire cross-examination, moreover, the jury could have inferred that Craig's grudging response meant nothing more than, "I really don't know. Stop badgering me and get off my back."

Further along in his cross-examination, Craig continued to deny that he had done the heavy lifting "hundreds of times before" but conceded that he could not fault Hub's arithmetic though he never conceded Hub's basis for its arithmetic computations:

Q: So would it be safe to say that you had lifted ten thousand foot rolls of paper hundreds of times before?

A: *No.*

Q: Well if you ... if you lifted the rolls once or twice a week for three to four years my arithmetic comes up to anywhere from a hundred fifty to four hundred times. Is that correct?

A: Yes *I guess it would be.* [Emphasis supplied].

Indeed, on redirect examination, Craig immediately refuted the factual premise on which Hub's arithmetic had been based:

Q: Mr. Craig, with regard to the ten thousand foot rolls of paper, did you use those rolls of paper every week?

A: No.

Even to consider to the extent we have the response "maybe once or twice a week," however, is to focus on the one response, out of many responses, more favorable to Hub, which we cannot do. If Craig himself gave two responses, one more favorable to his cause and one less favorable, we must evaluate Judge Wright's decision in light of the response more favorable to Craig. At the Commission hearing, the transcript of which was introduced before the jury, Craig also characterized the heavy lifting as something that only occurred "once in a while." Before the jury, Craig characterized the frequency of heavy lifting as, "it would be [on] rare occasions."

Looking at that version of the evidence most favorable to Craig and at all inferences that may be drawn therefrom, the jury had it within its fact-finding prerogative to conclude that the heavy lifting occurred "once in a while" or on "rare occasions." It was entitled to reject or to give little weight to everything else. That being the case, Judge Wright properly denied Hub's Motion for Judgment and submitted the case to the jury.

It follows from the proper submission of the case to the jury and the subsequent jury verdict in favor of Craig that Judge Wright also committed no error in denying Hub's earlier Motion for Summary Judgment. Self-evidently, there was a genuine dispute with respect to a material fact. The material fact that was genuinely disputed was whether the occupational frequency of Craig's required heavy lifting was, like an appearance of Halley's Comet, "unusual."

*JUDGMENT AFFIRMED COSTS TO BE PAID BY APPELLANTS.*