707 A.2d 412

**AMERICAN AIRLINES CORPORATION, et al.**

v.

**Lewis E. STOKES.**

**No. 410, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Feb. 26, 1998.

Reconsideration Denied April 28, 1998.

Anthony J. Zaccagnini (M. Matthew Mannion and Semmes, Bowen & Semmes, on the brief), Baltimore, for Appellants.

Thomas Tedori (Benjamin T. Boscolo and Chasen & Boscolo, Chartered, on the brief), Greenbelt, for Appellee.

Argued before MOYLAN and DAVIS, JJ., and ROSALYN B. BELL, Judge (retired), Specially Assigned.

MOYLAN, Judge.

The appellee, Lewis E. Stokes, allegedly sustained an injury to his back while working for the appellant, American Airlines Corporation. The appellee filed a claim with the Workers' Compensation Commission. The Commission disallowed the claim and the appellee appealed to the Circuit Court for Anne Arundel County. A jury there decided in the appellee's favor and the appellant has brought the present appeal. On appeal, there is raised the single claim that the trial court erroneously denied the appellant's Motion for Judgment *Non Obstante Veredicto.*

At the circuit court level, the appellee's appeal from the Workers' Compensation Commission was what is referred to as an essential trial *de novo.* In the circumstances, such as here, where the claimant has lost before the Commission and then appeals to the circuit court, the nature of such an essential trial *de novo* was discussed by us in *General Motors Corp. v. Bark,* 79 Md.App. 68, 79–80, 555 A.2d 542 (1989):

> If the claimant loses before the Commission and then appeals to the circuit court, the ... claimant has the burden of producing a *prima facie* case before the trial court, lest he suffer a directed verdict against him, just as he, as the original proponent, had that same burden before the Commission.... The claimant has, moreover, the same burden to persuade the trial court by a preponderance of the evidence that his claim is just as he had to persuade the Commission in the first instance.

The appellee, as the claimant, obviously carried his burden of persuasion at the circuit court level, for the jury rendered a verdict in his favor. The pertinent question before us, however, is whether the appellee carried his burden of initial production so as to have entitled him even to have the jury consider the case. If the appellee failed to meet that burden of production, the trial court committed error in denying the appellant's Motion for Judgment N.O.V.

On August 5, 1994, while employed by the appellant as a crew chief at Baltimore–Washington International Airport, the appellee was loading and unloading baggage from an American Eagle plane. During the process, the appellee experienced "tightness in his back." The appellee did not, however, report the incident to his supervisors because he "didn't think anything of it at the time." Despite the continued feeling of tightness in his lower back, the appellee returned to work on the next day, August 6. After clocking in, the appellee attempted to find out whether his crew had arrived for work. After being informed that they had not yet arrived, the appellee informed the ticket agent assigned to the flight that he was not feeling well and was going home. The appellee then left the airport and returned home.

After learning of the appellee's sudden departure, agents for the appellant called the appellee and informed him that he was placed on "doctor's note" leave. That required the appellee to obtain a doctor's note before being allowed to return to work. On August 8, the appellee went to his chiropractor in Nashville, Tennessee,[1] for the purpose of receiving medical treatment for his back. After receiving treatment, the appellee was cleared by his chiropractor to return to work. The appellant, however, refused to permit the appellee to return to work until it received a doctor's clearance. The appellant does not classify chiropractors as doctors. The appellant then sought the care of Dr. Raymond D. Drapkin, an orthopedic doctor.

On December 29, the appellee submitted a Notice of Employee's Claim to the Worker's Compensation Commission (Commission) relating to the August 5 accident. On February 28, 1995, a hearing was held and the Commission disallowed the claim. The appellee appealed that decision to the Circuit Court for Anne Arundel County and there requested a jury trial. On September 3, 1996, a jury trial was held. At the close of the appellee's case-in-chief, the appellant moved for a judgment based on the appellee's failure to produce expert medical testimony to prove causation. The trial court denied the motion. At the close of the entire case, the appellant again moved for a judgment on the same grounds. Again, the court denied the motion.[2]

---

1. The appellee lived and worked in Nashville from 1986 through July of 1994. He moved to Baltimore to take on his new assignment at BWI Airport just days before the incident of August 5, 1994. When he was required by the appellant to obtain a doctor's note before being allowed to return to work, he apparently felt more familiar and comfortable with contacts back in Nashville.

2. The record is unclear as to whether such motions were actually made. The record does indicate that bench conferences occurred both at the close of the appellee's case-in-chief and the close of all of the evidence. The court reporter, however, was unable to transcribe the substance of the conference. The appellant, however, claims that a motion for a judgment was made both at the close of the appellee's case-in-chief as well as at the end of trial and the appellee has not claimed otherwise.

On September 5, 1996, the jury reversed the Commission's decision, finding that the appellee had sustained an accidental injury arising out of and in the course of employment and that the injury resulted in the appellee's becoming disabled. The appellant then moved for judgment notwithstanding the verdict. The trial court, in a seven-page memorandum and order, denied the appellant's motion. This appeal was then noted.

The appellant's contention is that the requested Judgment N.O.V. should have been granted in its favor. The appellant argues its entitlement to the Judgment in two regards: 1) that the evidence of causation was not legally sufficient because of the absence of expert medical testimony establishing causation on a complicated medical question and 2) that the evidence the appellee suffered an accidental injury arising out of and in the course of his employment as a result of an unusual occurrence or condition of employment was not legally sufficient. We direct our attention first to the issue of whether causation was a complicated medical question.

In *S.B. Thomas, Inc. v. Thompson*, 114 Md.App. 357, 689 A.2d 1301 (1997), we considered at great length the issue of when a question of causation presents a complicated medical issue requiring expert medical conclusions. We surveyed all of the cases from the Court of Appeals and from this Court, including both those finding that certain issues were complicated medical questions and those finding that other issues were not. 114 Md.App. at 371–81, 689 A.2d 1301. We then attempted, at least in a rough sense, a general synthesis of that body of case law:

> To the extent to which we can distill any general wisdom out of the case law, it seems to be this. A genuine jury issue as to the causal relationship between an earlier injury and a subsequent trauma may sometimes be generated, even in the absence of expert legal testimony, when some combination of the following circumstances is present: 1) a very close temporal relationship between the initial injury

---

This Court will assume that such motions were properly made and denied.

and the onset of the trauma; 2) the manifestation of the trauma in precisely the same part of the body that received the impact of the initial injury; 3) as in *Schweitzer v. Showell* [19 Md.App. 537, 313 A.2d 97 (1974)], some medical testimony, albeit falling short of a certain diagnosis; and 4) an obvious cause-and-effect relationship that is within the common knowledge of laymen.

Conversely, the causal relationship will almost always be deemed a complicated medical question and expert medical testimony will almost always be required when one or more of the following circumstances is present: 1) some significant passage of time between the initial injury and the onset of the trauma; 2) the impact of the initial injury on one part of the body and the manifestation of the trauma in some remote part; 3) the absence of any medical testimony; and 4) a more arcane cause-and-effect relationship that is not part of common lay experience (the ileitis, the pancreatitis, etc.)

114 Md.App. at 381–82, 689 A.2d 1301.

In the last analysis, however, we concluded that the issue is too elusive to permit of any mathematical formula or hard and fast rule and that the ultimate appellate determination that will have to be made on a case-by-case basis will be in some measure an inevitably subjective judgment call:

When all is said and done, *we are perhaps reduced to a truism: the stronger the case for the causal connection even absent expert medical testimony, the lesser the need for such testimony; the weaker the non-medical case for the causal connection, the greater the need for such testimony.* There is more involved, of course, than a simple inverse proportion between the strength of the non-medical-expert case of causation and the need for expert medical testimony.[2] Some questions of causation might involve medical knowledge so recondite that expert testimony would always be required. Other questions of causation would not. *There can be no hard and fast rule controlling all cases. It does appear clear, however, that when there is a genuine issue as to whether there is a causal connection between an*

*earlier injury and a subsequent disability, in the majority of cases it will be a complicated medical question requiring, as a matter of law, expert medical testimony.*

[2] Is it possible that all the juridical profundities of legal mandarins, pundits, and poo-bahs have produced something that could have been as well said by a bright fifth grader?

*"If it's needed to prove your case, you have to have it; if it isn't, you don't."*

114 Md.App. at 382–83, 689 A.2d 1301 (Emphasis supplied).

On the critical issue of causation between the tightness in the appellee's back experienced on August 5, 1994 and the subsequent back condition that was the basis for his claim to the Workers' Compensation Commission, the appellee presented no expert medical evidence. The subsequent back condition was described by the appellee's treating physician as "lumbar radiculopathy[3] and a chronic lumbosacral strain." On the basis of that diagnosis, the jury awarded the appellee "temporary total disability benefits from August 5, 1994 through March 20, 1996, inclusive." He presented his own lay testimony that, despite earlier back problems, he had been essentially free of pain for several years prior to August 5, 1994. He described feeling tightness when he lifted a piece of luggage on August 5. He described tightness in his back the following day, sufficient to send him home from work. He further described general discomfort in that area of his back persisting until the time he filed his claim. The proffered significance was essentially that of *"Post hoc; ergo propter hoc."*

His primary treatment for his back ailment was from Dr. Raymond D. Drapkin. Dr. Drapkin did not testify but his medical records were introduced into evidence. Although Dr. Drapkin described the treatment he had administered, he offered no opinion as to the causal relationship between the August 5 incident and the subsequent condition.

---

**3.** Damage to the lumbar nerve root.

■    The appellee strains to attribute the requisite status of expert medical testimony to a snippet of cross-examination of the appellant's expert, Dr. Edward R. Cohen, introduced in the form of a video-taped deposition.  Specifically, the appellee seeks solace in two words of response in the following portions of the deposition of Dr. Cohen to establish the connection:

Q:  Is it possible or is it probable that Mr. Stokes could have aggravated a pre-existing condition or that his pre-existing degenerative condition by lifting bags on August the 5th of 1994?

A:  *Sure.*
    \* \* \* \*

Q:  As I understand your testimony, it's your testimony within a reasonable degree of medical certainty that the activity of August 5th, 1994, may have activated [aggravated?] this pre-existing condition?

A:  *Sure.*

(Emphasis supplied).

That does not constitute expert medical testimony with the required degree of medical certainty for several reasons.  In the first place, even the strained significance attributed to the exchange by the appellee, to wit, that Dr. Cohen is agreeing with appellee's counsel, does not establish that the condition that was the basis for the appellee's Workers' Compensation claim was the result of any aggravation that occurred on August 5.  The exchange can well be read as referring to nothing more weighty than that the tightness in the back experienced on August 5 itself was an aggravation of the long history of preexisting back problems.  Without a prior history of back problems, the lifting of August 5 might well not have been enough in itself to have caused discomfort.  The unilluminated exchange as readily meant 1) that the discomfort of August 5 was the *effect* of what had happened before as 2) that the experience of August 5 combined with the history was the *cause* of what came after.  Unless such a temporary aggravation had a lasting effect so as to have been an effective cause

of the subsequent condition, a mere temporary aggravation on that single day, or for a period of several days, lacked causative significance.

Our reading of the deposition of Dr. Cohen in full context, moreover, causes us to place his casual and monosyllabic responses to those fragments of cross-examination in a far less significant light. He had already testified, with requisite medical certainty, that there was no causative relationship between the minor strain of August 5 and the subsequent condition. When being asked about alternative possibilities, he simply responded with almost cavalier disdain, "Sure, anything is possible." He was not testifying to that effect. He was not wilting or wavering under the hammer blows of cross-examination. He was simply verbally fencing with his cross-examiner: "Sure, other things are possible, but it's not my opinion; I've already told you what my opinion is." That is all that can reasonably be read into that exchange.

We hold that *under the circumstances present in this case* the cause-and-effect relationship between the incident of August 5 and the subsequent back condition was a complicated medical question requiring, as a matter of law, expert medical evidence.

It is as important, perhaps, to note what we are not holding as to note what we are holding. We are not necessarily holding (we, indeed, are intimating nothing in that regard) that every cause-and-effect relationship between a back strain on one date and the condition of an injured back some four or five months later would always present a complicated medical question calling for expert medical evidence. If the two phenomena of the putative cause and the putative effect were before us in a vacuum, with no plausible alternative cause needing to be discounted, the cause-and-effect relationship might well be permissibly inferable without medical testimony, particularly where the earlier incident and the later condition involved the same part of the body. We intimate nothing with respect to such a situation, however, for that is not the set of circumstances before us in this case.

■ The putative cause and the putative effect in this case, however, do not exist in a vacuum. There are no less than three significant additional circumstances that escalate the issue of causation here into a more complicated medical question.

In the first place, this was an appeal to the circuit court from a decision of the Workers' Compensation Commission. The Commission expressly found that there was no causal connection between the August 5 incident and the subsequent disability:

> The Commission finds on the first and second issues that the claimant did not sustain an accidental injury arising out of and in the course of employment as alleged to have occurred on August 5, 1994; and finds that the disability of the claimant is not the result of the alleged accidental injury; therefore, the Commission ... will disallow the claim filed herein.

On appeal to the circuit court, the prior decision of the Workers' Compensation Commission is treated as being presumptively correct. One of the procedural incidents of such a presumption is that the fact finder at the circuit court level will be informed of the earlier decision and of its presumptive correctness and will be entitled to give it evidentiary significance. As we explained in *S.B. Thomas, Inc. v. Thompson,* 114 Md.App. 357, 366, 689 A.2d 1301 (1997):

> *General Motors Corp. v. Bark* noted that one difference between a true trial *de novo* and an essential trial *de novo* is that in the latter, one does not treat the adjudication appealed from as if it had never occurred. It is, rather, the case that *the presumptively correct outcome of that adjudication is admissible as an item of evidence* and is the proper subject of a jury instruction. *Holman v. Kelly Catering,* 334 Md. 480, 639 A.2d 701 (1994). *It is an evidentiary fact that may well tip the scales of persuasion.*

(Emphasis supplied).

A second significant additional factor is that the putative cause and putative effect did not exist in a vacuum, to wit, in

the total absence of any other plausible explanation for the effect. The appellee had a long history of chronic back problems that presented a far more likely explanation for his ultimate disability than the modest strain he suffered on August 5. Much of that history was offered by the appellee himself. He testified that, since being hired by the appellant in 1967, he had injured his lower back numerous times.

Q: All right. Now, before coming to BWI in July of 1994, had you ever injured your back?

A: Yes.

Q: When was the first time you injured your back?

A: In 1973.

  * * * *

Q: After the first incident in 1973, did you have any further problems with your back?

A: Yes, I did. I had problems with my back in '74, '75, '76 and I believe it was in '77 when I finally submitted to the medical board to be placed on restrictive duties ...

  * * * *

Q: Did you have a problem with your back in 1987?

A: Yes....

  * * * *

Q: What affect if any did that [the 1987 event] have on your back?

A: I re-injured my back.

  * * * *

Q: Did you have any off the job incidents where you injured your back at any time after 1987?

A: Yes, in '92 while driving home from work ... and I was in a neck brace and a back brace for a week.

Dr. Cohen also testified as to the appellee's history of back problems:

He has a whole list of prior back problems predating this, dating back many, many years. Apparently as best I could ascertain it was starting in 1973 when he first hurt his back.

He has had multiple either reinjuries or flare ups up until almost the present time. In addition, in 1992 there was documentation of an automobile accident which involved his back for which he also apparently received treatment.

In addition to taking from the appellee his twenty-year history of back problems, Dr. Cohen took a series of X-rays. On the subject of chronic spinal deterioration, the X-rays spoke for themselves, at least through the interpretive medium of Dr. Cohen's testimony:

> I took x-rays of his back. I took two views, I took a front and side view and it revealed significant arthritic spurring at virtually every vertebrae in the low back. We number the vertebrae from one through five, and everyone had spurring, some larger than others, but these spurs would indicate a process had been there pretty close to a decade to get that big.

He went on to elaborate on the subject of the bone spurs:

> When we get bone spurs, the corners start to get overgrowth, looking like a parrot's beak or bird's beak, there are little projections that are little points and they get bigger and bigger and bigger. In this particular case the largest one was probably three-quarters of an inch, between a half-inch and three-quarters of an inch, which is significantly, which is quite significant, if you will. And these were present to a different size, as I said, throughout the lumbar spine.

The third and final complicating factor was that there was expert testimony from a trained orthopedic surgeon that there was no causal connection between the August 5 incident and the appellee's back condition that was the basis for his claim:

> Q: Dr. Cohen, based upon your physical examination of Mr. Stokes, your review of the medical records, your knowledge and training in the field of orthopedic surgery, *do you have an opinion based upon a reasonable degree of medical certainty as to whether or not Mr. Stokes' medical condition or disability is the result of anything that might have occurred on August 5, 1994:*

A: My opinion from reviewing 170 or so pages of medical records, examining him, x-raying him, talking to him, *my opinion was his condition for which I saw him and the symptoms which he described over the past two years was not occupationally related in any way.*

(Emphasis supplied).

It is clear that evidence, including expert medical testimony, establishing the possibility of an alternative theory of causation may be the decisive factor that transforms a non-medically complicated question of causation, requiring no expert medical testimony, into a complicated medical question, requiring such testimony as a matter of law. Evidence of such an alternative theory of causation would be capable of performing this transforming function regardless of which party introduces it and regardless of the stage of the trial at which it is introduced.[4]

In *Strong v. Prince George's County,* 77 Md.App. 177, 549 A.2d 1142 (1988), we held that the issue of causation was a

---

**4.** The implications of this are significant. If 1) evidence introduced in the course of a trial may escalate an initially non-medically complicated question into a medically complicated one and 2) such an escalation increases the qualitative burden of proof on a plaintiff to be entitled to take a case to the jury, that necessarily means that the burden of production may shift in the course of a trial. What might have satisfied the burden of production at the end of the plaintiff's case need not necessarily satisfy the burden of production at the end of the entire case. This phenomenon is not as anomalous as it might at first appear. There is no increase in the number of substantive elements of the proposition to be proved (the crime, the tort, the breach of contract, etc.) by the proponent; there is only, as a result of unfolding trial developments, an enhancement of the quality of proof required to establish a *prima facie* case as to one of those elements.

In this case, moreover, even that mere evidentiary shift in the burden of production was not contingent on developments in the case for the defense. Both 1) the presumptively correct decision of the Workers' Compensation Commission and 2) the history of the appellee's back problems, as developed in his own cross-examination, were in evidence as of the end of the claimant's case and were enough to make the issue of causation a medically complicated one. We are simply taking the occasion to note, as a matter of academic interest, that a shift in the burden of production, at least of this evidentiary variety, could occur as a result of evidence produced at a later stage of the trial.

complicated medical question regarding expert medical testimony. As Judge Wenner there pointed out for this Court, reports submitted by medical experts suggesting alternative theories of causation were decisive factors in creating a complicated medical question where one might not have existed in the absence of such reports:

[E]xpert medical testimony was necessary to establish the causal connection, if any, between the accident and the pancreatitis Gheen developed several months later. *Reports submitted to the commission by various medical experts established that a number of things can cause a person to develop pancreatitis.* A severe injury to the stomach is just one of them. Moreover, *at least one medical expert wrote that, in view of the fact that the symptoms did not develop until several months after the accident, it was quite unlikely that the pancreatitis was caused by the accident. Under these circumstances we think that expert medical testimony should have been presented.*

77 Md.App. at 184, 549 A.2d 1142 (Emphasis supplied).

To ask a jury whether they are persuaded 1) to discount the presumptively correct decision of the Workers' Compensation Commission, 2) to discount the well documented twenty-year history of chronic back deterioration as the likely explanation for the appellee's ultimate back problems, and 3) to discount the expert medical opinion of a trained orthopedic surgeon to the contrary and to attribute the appellee's condition, instead, to an occupational strain he experienced on a single day, five months prior to giving his employer formal notice of the compensation claim, is to ask the jury to wrestle with a complicated medical question. The appellee was not entitled to have the jury entertain such a question unless he could furnish it with expert medical testimony supporting the answer he urged the jury to give.

Absent such expert medical testimony, the evidence of the claimant-appellee in this case was not legally sufficient to have permitted the case to go to the jury on his claim for "temporary total disability benefits from August 5, 1994 through

March 20, 1996, inclusive." The trial judge, therefore, was in error in failing to grant the Judgment N.O.V. requested by the appellant on that issue. Our disposition of the case on the basis of that subcontention, however, does not entirely moot the appellant's other subcontention.

■ The appellant contends that it was entitled to a Judgment N.O.V. for the alternative reason that the evidence was not legally sufficient to have permitted the jury reasonably to find that the appellee had sustained an accidental injury arising out of and in the course of his employment as a result of an unusual occurrence or condition of his employment as required by Maryland Workers' Compensation Law.

In *Sargent v. Board of Education,* 49 Md.App. 577, 580–81, 433 A.2d 1209 (1981), this Court stated the applicable test:

While the majority of jurisdictions consider an injury to be accidental if it was the unexpected result of the routine performance of the employee's duties, the Maryland Court of Appeals has chosen to adhere to a much narrower view. Under this more restrictive view, in order for an injury sustained during the course of his employment to be "accidental," and thus compensable, it must result "from some *unusual* strain, exertion or condition in the employment."

(Emphasis in original) *See also Stancliff v. H.B. Davis Co.,* 208 Md. 191, 198, 117 A.2d 577 (1955); *Kelly–Springfield Co. v. Daniels,* 199 Md. 156, 85 A.2d 795 (1952); *Schemmel v. Gatch and Sons,* 164 Md. 671, 680–81, 166 A. 39 (1933); *State Roads Commission v. Reynolds,* 164 Md. 539, 165 A. 475 (1933); *Whiting–Turner v. McLaughlin,* 11 Md.App. 360, 362–65, 274 A.2d 390 (1971).

Speaking for this Court in *Sargent,* Judge Wilner elaborated further on the issue of what is an unusual strain or unusual exertion:

There have been no generic definitions of what constitutes an unusual condition of employment or an unusual strain or exertion; those criteria have been defined more or less on a case-by-case basis, with the court, in each instance looking to the nature of the employee's routine duties, the normal

conditions of employment, and the usual mental and physical demands placed upon the employee at work.

The common denominator, if there is one, is whether, in the course of the activity leading to the accident the employee had departed from the normal routine of his job or whether the job conditions being performed departed from the normality to which the employee was accustomed on a daily basis.

49 Md.App. at 581–82, 433 A.2d 1209 (Footnote omitted).

The appellant put on three witnesses to prove that the lifting of baggage by the appellee on August 5 was not in any sense unusual. Robert Maloney was the appellee's acting supervisor when the appellee initially reported to BWI Airport on July 25. Maloney testified that an American Airlines flight service crew chief at BWI Airport was expected to load and unload airplanes as part of his normal duties. He testified that this was company policy. Donald P. Martinek, the appellee's direct supervisor on August 5, confirmed the testimony of Maloney that the loading and unloading of baggage was part of the normal duties of a BWI crew chief. Both Maloney and Martinek testified that the appellee was aware of this fact when he started working at BWI. The third witness was John Clapsadle, the appellee's union shop steward, on August 5. He also testified that a crew chief at BWI was required to load and unload baggage.

The flaw in the appellant's evidence is that it concerned the overall job description of a BWI crew chief and not the routine versus unusual nature of the duty in terms of its performance by the appellee himself. In *Sargent,* Judge Wilner discounted the significance of a job description:

The mere inclusion of the boiler cleaning duty within appellant's overall job description is not determinative of whether an injury sustained is compensable. The relevant criterion, as we have noted, is whether the duty is *routinely* performed or performed with enough frequency so as not to constitute unusual work. This Court would be setting dangerous precedent if we were to hold that any duty included

within a job description is routine and usual, regardless of its nature or frequency of performance. That would be an open invitation to subversion of the Workmen's Compensation Law, which is to be liberally construed; and we decline to extend such an invitation.

49 Md.App. at 583, 433 A.2d 1209 (Emphasis in original). The significant criterion is not the job description but the relative frequency with which the particular task in question is performed by the employee. The *Sargent* opinion further explained:

In judging whether a particular task is a "normal incident" of the employee's work (or conversely, whether an injury resulted from an "unusual condition" or "unusual strain or exertion"), we must consider two factors: (1) the nature of the particular task in comparison to the other duties required of the employee, and (2) the relative frequency with which the particular task is required to be performed in comparison to the other incidents of the job.

49 Md.App. at 582, 433 A.2d 1209.

There was testimony from the appellee that whatever the job description may have been, the lifting he performed on August 5 was for him and as of that day unusual. He had been employed by the appellant for approximately twenty-eight years. For the last ten of those years, he had been a crew chief. In those airports in which he had served as crew chief, moreover, the crew chief was not required to load or unload baggage. He explained that his regular duties had been merely supervisory. He supervised the towing, the cleaning, and the loading and unloading of the aircraft by others. He was responsible for maintaining the safety of the aircraft. He testified that the last time he actually lifted baggage had been in 1987. In her Memorandum, Opinion and Order denying the appellant's motion for Judgment N.O.V., the trial judge noted:

Clearly, the jury chose to believe the Claimant's testimony and found that, despite testimony that lifting baggage was part of the Claimant's job description, lifting baggage con-

stituted an unusual condition of employment or an unusual strain or exertion *for this Claimant.*

(Emphasis in original).

In *Hub Labels v. Craig,* 110 Md.App. 661, 662, 678 A.2d 594 (1996), we pointed out that the quality of the unusual, like the quality of beauty, is in the eye of the beholder and that the eye of the pertinent beholder is in most instances that of the fact finder and not that of the legal referee. In stressing that the issue of whether an occupational exertion is usual or unusual is generally speaking a question of fact, we observed:

> Believing that the territory of the fact finder is not a narrow strip between the forty yard lines but the broad expanse between the end zones, we necessarily believe that the question of whether the heavy lifting that caused the injury to Craig's back in this case was "usual" or "unusual" was a matter of fact properly entrusted to the fact finder.

110 Md.App. at 671, 678 A.2d 594.

The trial judge in this case properly ruled that there had been a genuine dispute of material fact with respect to this question, that the issue had properly been given to the jury, and that the appellant was not, therefore, entitled to a Judgment N.O.V.:

> [T]his Court finds that the nature of lifting baggage is distinct from the Claimant's other duties, such as using the computer or supervising other employees, because those other duties require substantially less physical exertion. The Claimant also testified that the last time he, personally, lifted baggage was in 1987. If one believes the testimony that the last time the Claimant lifted baggage was nine (9) years ago, then the frequency with which this duty was required of this Claimant was clearly minimal in comparison to his other duties. Upon consideration of the two factors to determine whether lifting baggage was a "normal incident" of the Claimant's work or whether an injury resulted from an "unusual condition" or "unusual strain or exertion," this Court finds that the Claimant, by his own testimony, presented legally competent evidence to overcome the pre-

sumption of correctness of the Commission's order so that the jury could have found as they did.

Thus, we hold that there was a genuine jury question as to whether the trauma sustained by the appellee on August 5 was an accidental injury arising out of and in the course of his employment as a result of an unusual occurrence. The jury so found and the trial judge properly let that verdict stand. Although, as we have held, there was no legally sufficient case to connect the accident of August 5 to the subsequent back condition that was the basis of the appellee's claim for temporary total disability benefits from August 5, 1994 through March 20, 1996, there was arguably nonetheless a sustainable claim for some more minimal award for the injury of August 5 itself and for the more immediate sequelae associated with it. We will, therefore, remand the case to the Workers' Compensation Commission for that more limited reconsideration.

*JUDGMENT REVERSED; CASE REMANDED TO WORKERS' COMPENSATION COMMISSION FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND APPELLEE.*