868 A.2d 944

**Lowell Hudson TODD, Jr.**

v.

**STATE of Maryland.**

No. 2160, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Feb. 25, 2005.

Brian Saccenti (Nancy S. Forster, Public Defender, on brief), for appellant.

Michelle W. Cole (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel MURPHY, C.J., JAMES S. GETTY, (Retired, specially assigned), THEODORE G. BLOOM, (Retired, specially assigned) JJ.

**336**

BLOOM, J.

At a bench trial in the Circuit Court for Wicomico County, appellant, Lowell Hudson Todd, Jr., was convicted of causing a life-threatening injury by motor vehicle while under the influence of alcohol, driving while intoxicated, driving while under the influence of alcohol, driving while intoxicated *per se*, and negligent driving.[1] The court merged the lesser offenses into the greater offense and sentenced Todd to three years' imprisonment for causing a life-threatening injury by motor vehicle while intoxicated.

## ISSUES

In this appeal, Todd argues, in essence:

I. The statute that prohibits and penalizes the causation of a life-threatening injury by motor vehicle while intoxicated or under the influence of alcohol is unconstitutionally vague.

II. Even if the statute is not unconstitutionally vague, the trial court erred by applying an incorrect standard in determining that the injuries in question were life-threatening.

---

1. Todd was charged under Md.Code (1977, 1999 Repl.Vol.), §§ 21–901.1 and 21–902 of the Transp. Art., and Md.Code (1957, 1996 Repl.Vol., 2000 Cum.Supp.), § 388B of Art. 27.

Effective September 30, 2001, the legislature amended § 21–902 of the Transportation Article to substitute, *inter alia*, the term "under the influence of alcohol" for "intoxicated" and the term "impaired by" for "under the influence of." *See* 2001 Laws of Md., Chapter 4. *See generally* Md.Code (1977, 2002 Repl.Vol., 2004 Cum.Supp.), § 21–902 of the Transp. Art.

Pursuant to the code revision process, moreover, the legislature later repealed former § 388B of the Criminal Law Article and re-enacted it, without substantive change, as § 3–211 of the Criminal Law Article. *See* 2002 Laws of Md., Chapter 26. *See generally* Md.Code (2002, 2004 Cum.Supp.), § 3–211 of the Crim. Law Art. The 2001 changes to § 21–902 of the Transportation Article were recognized by the legislature in the enactment of § 3–211 of the Criminal Law Article.

For the sake of simplicity, and because the amendment to § 21–902 and the repeal and re-enactment of former § 388B effected no substantive changes, we shall refer in our analysis to the statutes as they existed at the time Todd was charged.

III. The evidence was insufficient to support the trial
court's finding that the injuries in question were life-
threatening.

Finding no merit in any of these arguments, we shall affirm
the judgment of the trial court.

## FACTS

Todd's convictions stem from a two-car accident that oc-
curred in Wicomico County on the early evening of August 3,
2001. Todd does not now dispute that the car he was driving
crossed the center line and collided head-on with a car that
was being driven by James Vance and in which Vance's three
children were riding. Nor does Todd dispute that he was
intoxicated at the time.

The State presented evidence that Vance and all three of his
children suffered injuries. The most seriously injured was 12–
year old Sarah Vance, who had been riding in the back seat,
on the passenger side.

Immediately after the crash, James Vance turned to check
on his children and saw that Sarah had "a big hole in her
head." Wallace Bennett, an emergency medical technician
who was driving behind Vance and saw the accident occur,
testified that he stopped to help. Bennett told the court that
Sarah was his "priority patient" because "she was in and out
of consciousness, she had a cut on her forehead that was
pretty well deep around, her eyes were turning black and
blue." Another witness, Jack Bozek, was standing by the side
of the road and witnessed the crash. Bozek approached the
vehicles to try to help. He noticed that Sarah's "head was all
split wide open" and he "thought she was dead . . . ."

Trooper George Noonan of the Maryland State Police ar-
rived on the scene within minutes of the accident. He testi-
fied that, because "all of the injuries . . . seemed to be life
threatening at the time," his first priority was "to make sure
they get them to the hospital." More emergency medical
personnel arrived, and the Vances as well as Todd were then

taken to Peninsula Regional Medical Center ("Peninsula") in Salisbury.

Kathy Vance, the wife of James Vance and mother of the three injured children, met her family at Peninsula. As to Sarah's condition, Mrs. Vance testified:

Well, when I first got there I didn't even know her. . . . She was, had a cut from ear to ear across the top of her head, and she was bleeding pretty badly. She was, her face was swollen so much that it was almost black, and her eyes were swollen shut. She had a lot of blood on her face. They were working on her trying to get a breathing tube down her throat to stabilize her so they could take her to surgery.

She was unconscious. She didn't know anything.

Mrs. Vance then explained that the physicians at Peninsula "couldn't stabilize" Sarah, and because Sarah had bleeding on her brain they "had no choice but to . . . take her to surgery right away. . . ." Mrs. Vance testified that, after the physicians at Peninsula operated, "they did not close the wound, they just pulled the skin up over the wound and put a bandage on her and left her like that." The next day, after Sarah's condition was sufficiently stabilized, "she was flown to Johns Hopkins where they were waiting for her to take her into surgery." At Johns Hopkins Hospital ("Hopkins"), "they pulled [the] skin back and operated on her head more for the bleed on the brain."

Mrs. Vance testified that Sarah "was taken to the ICU" immediately after the surgery at Hopkins, and then "was taken to . . . a step-down unit for several days." She added that since then Sarah has undergone several additional surgeries to repair portions of her face that were "completely crushed" in the accident.

Sarah's medical records from both Peninsula and Hopkins were admitted into evidence. The emergency room physician at Peninsula who treated Sarah upon her arrival wrote in his report: "THIS IS A 12–YEAR–OLD WITH SEVERE CRANIAL INJURY, EPIDURAL BLEED, WHO NEED[S] EM-

ERGENT CRANIOTOMY." He added, "Once she is stable from a neurosurgical standpoint, she will be transferred to a specialty center for attention to her orbital fracture."

## I.

### Void–for–Vagueness Doctrine

Todd was found guilty of, *inter alia,* violating former Md. Code (1957, 1996 Repl.Vol., 2000 Cum.Supp.), § 388B(b) and (c) of Art. 27 in connection with Sarah Vance's injuries. The statute provided:

(b) Driving while intoxicated.—A person who causes a life[-]threatening injury to another as a result of the person's negligent driving, operation, or control of a motor vehicle or vessel while intoxicated or intoxicated per se is guilty of a misdemeanor to be known as "life[-]threatening injury by motor vehicle or vessel while intoxicated or intoxicated per se," and on conviction the person shall be punished by imprisonment for not more than 3 years or a fine of not more than $5,000 or both.

(c) *Driving while under the influence of alcohol.*—A person who causes a life[-]threatening injury to another as a result of the person's negligent driving, operation, or control of a motor vehicle or vessel while under the influence of alcohol is guilty of a misdemeanor to be know as "life[-]threatening injury by motor vehicle or vessel while under the influence of alcohol," and on conviction the person shall be punished by imprisonment for not more than 2 years or a fine of not more than $3,000 or both.

Section 388B became effective on October 1, 1996. *See* 1996 Laws of Maryland, Chapter 427. Todd points out that, prior to the enactment of that statute, there was some discussion among legislators concerning whether the term "life-threatening injury" should be defined and, if so, how it should be defined. *See* bill files for Senate Bill 277 (1996) and House Bill 32 (1996). At least one lawmaker urged that the term be defined as "an injury that creates an immediate and substantial risk of death." *See* bill file for Senate Bill 277 (1996).

The 1996 General Assembly ultimately decided not to define the term, however.[2] Todd argues that the legislature's failure to include a definition of "life-threatening injury" in the statute left the term "impermissibly ambiguous because reasonable people can and do reach widely divergent conclusions on what it means." He therefore concludes that the statute is void for vagueness.

"The void-for-vagueness doctrine as applied to the analysis of penal statutes requires that the statute be 'sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.'" *Galloway v. State*, 365 Md. 599, 614, 781 A.2d 851 (2001) (citation omitted), *cert. denied*, 535 U.S. 990, 122 S.Ct. 1547, 152 L.Ed.2d 472 (2002). As the Court of Appeals has summarized:

> In determining the constitutionality of statutes, "[t]he basic rule is that there is a presumption" that the statute is valid.... We are reluctant to find a statute unconstitutional if, "by any construction, it can be sustained." ... If, however, a statute violates a "mandatory provision" of the Constitution, "we are required to declare such an act unconstitutional and void." ... Therefore, if it is established that a statute is vague—offends due process—and/or overbroad—sweeps within the ambit of constitutionally "protect-

---

**2.** During the 2003 and 2004 legislative sessions of the General Assembly, bills were introduced that would have defined "life-threatening injury." Under House Bill 413 (2004), "life-threatening injury" would have meant

an injury that:

(i) involves a substantial risk of death;

(ii) results in loss of substantial impairment of the function of a bodily member or organ;

(iii) results in injury to mental faculty that is permanent or declared by a physician as likely to be permanent, or

(iv) results in obvious disfigurement that is permanent or declared by a physician as likely to be permanent.

*See* House Bill 413 (2004). Under Senate Bill 11 (2004), the term "life-threatening injury" would have been defined as a "physical injury that creates a substantial risk of death". Under Senate Bill 516 (2003), the term would have been defined as "an injury involving a substantial risk of death." None of the proposals was adopted.

ed expressive or associational rights"—then the statute is unconstitutional. The party attacking the statute has the burden of establishing its unconstitutionality....

*Id.* at 610–11, 781 A.2d 851 (citations omitted) (footnotes omitted).

"[W]hen considering the void-for-vagueness doctrine, courts consistently consider two criteria or rationales. The first rationale is the fair notice principle that 'persons of ordinary intelligence and experience be afforded a reasonable opportunity to know what is prohibited, so that they may govern their behavior accordingly.' The standard for determining whether a statute provides fair notice is 'whether persons "of common intelligence must necessarily guess at [the statute's] meaning."' A statute is not vague under the fair notice principle if the meaning 'of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, if they possess a common and generally accepted meaning.'"

*Id.* at 615, 781 A.2d 851 (citations omitted) (emphasis omitted). *See also Eanes v. State,* 318 Md. 436, 459, 569 A.2d 604 (1990) ("A law is not vague simply because it requires conformity to an imprecise normative standard").

■■■ "The second criterion of the vagueness doctrine regards enforcement of the statute. This rationale exists 'to ensure that criminal statutes provide "legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligations it is to enforce, apply and administer the penal laws."'" *Galloway,* 365 Md. at 615–16, 781 A.2d 851 (citations omitted).

[A] statute is not unconstitutionally vague

"merely because it allows for the exercise of some discretion on the part of law enforcement and judicial officials. It is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it

will be held unconstitutional under this second arm of the vagueness principle."

*Id.* at 616, 781 A.2d 851 (citation omitted).

 "As a general rule, the application of the void-for-vagueness doctrine is based on the application of the statute to the 'facts at hand.'" *Id.* (citation omitted). "[T]he vagueness doctrine is designed to balance the need for criminal statutes ' "general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." ' " *McKenzie v. State,* 131 Md.App. 124, 137, 748 A.2d 67 (2000) (citations omitted). Upon interpreting the "facts at hand," the Court of Appeals rejected vagueness challenges in: *Galloway,* 365 Md. at 608, 781 A.2d 851 upholding former Md.Code (1957, 1996 Repl.Vol., 2000 Cum.Supp.), § 123(c) of Art. 27 (now Md.Code (2002), § 3–803(a)(1) of the Criminal Law Article (C.L.)), which prohibited a person from "follow[ing] another person in or about a public place or maliciously engag[ing] in a course of conduct that alarms or *seriously* annoys another person . . . [w]ith intent to harass, alarm, or annoy the other person"; *Williams v. State,* 329 Md. 1, 8, 616 A.2d 1275 (1992) (upholding former Md.Code (1957, 1992 Repl.Vol.), § 286(g) of Art. 27 (now Md.Code (2002), C.L. § 5–613(a)), which prohibited persons from being drug kingpins and defined "drug kingpin" as an "organizer, supervisor, financier, or manager" in a drug conspiracy; *Eanes v. State,* 318 Md. at 461, 569 A.2d 604 upholding former Md.Code (1957, 1987 Repl.Vol.), § 121 of Art. 27 (now, in substantive part, Md.Code (2002), C.L. § 10–201(c)(5)), which prohibited "loud and unseemly noises" as disorderly conduct); and *Bowers v. State,* 283 Md. 115, 125, 389 A.2d 341 (1978) upholding former Md.Code (1957, 1976 Repl.Vol.), § 35A(b)(7)(A) of Art. 27 (now Md.Code (2002, 2004 Cum.Supp.), C.L. § 3–601, which defined child abuse as, *inter alia,* the "cruel or inhumane" treatment of a minor). Similarly, in *McKenzie,* 131 Md.App. at 137, 748 A.2d 67, this Court upheld Maryland's anti-hazing statute, which defined "haze" as "doing an act or causing any situation which recklessly or intentionally subject a student to the risk of serious bodily

injury for the purpose of initiation into a student organization of a school, college, or university." Former Md.Code (1957, 1996 Repl.Vol.), § 268H of Article 27 now Md.Code (2002), C.L. § 3–607.

"In contrast, ... when Maryland Courts *have held* statutes and ordinances void for vagueness, the enforcement action challenged had created an absurd result, explicitly illustrating for the court the problems with the statute." *McKenzie*, 131 Md.App. at 140, 748 A.2d 67. For example, in *In Re Leroy T.*, 285 Md. 508, 403 A.2d 1226 (1979), a juvenile who was arrested while allegedly trying to break into a car was accused of, and adjudicated delinquent for, the possession of a burglary tool— in his case a pair of pliers—in violation of former Baltimore City Code, Art. 19, § 9(a)(5). The juvenile argued upon appeal that the ordinance was unconstitutionally vague, and the Court of Appeals agreed. The Court observed that § 9(a)(5) prohibited the possession of any "device, instrument, or article *commonly used*, designed or specially adopted for criminal use." 285 Md. at 510, 403 A.2d 1226. The State admitted, and the Court concluded, that "almost any common article or instrument imaginable, which might be used by persons in the course of committing unlawful acts, would be encompassed by § 9(a)(5)." *Id.* at 512–13, 403 A.2d 1226.

Similarly, in *Ashton v. Brown*, 339 Md. 70, 660 A.2d 447 (1995), a Frederick City ordinance established a curfew for juveniles who were not accompanied by adults, *see* former Frederick City Code § 15–10 (1966, 1992 Supp.), and created a variety of exceptions, including one for any "child attending a cultural, scholastic, athletic or recreational activity supervised by a bona fide organization." *Id.* at 89, § 15–11. A group of teenagers who were arrested after attending a youth-oriented event sponsored by a local Chinese restaurant, and who were later found guilty of violating the curfew, challenged the constitutionality of the ordinance. The Court of Appeals invalidated the ordinance because it failed to clearly define which organizations were to be considered "bona fide." 339

Md. at 89, 660 A.2d 447. The Court stated: "It must be possible for citizens to decide whether an unaccompanied seventeen year old might be detained in Frederick under the curfew ordinance for attending a midnight church service, a baseball game that ran into extra innings, a concert at Hood College, or a movie that ended after eleven." *Id.*

With respect to the facts in this case, we are satisfied that the term "life-threatening injury" is neither ambiguous nor mysterious. The term can be readily and indisputably defined by reference to a dictionary. *See* 823 CONCISE OXFORD ENGLISH DICTIONARY (11th ed.2004) (defining "life-threatening" as "potentially fatal"); 1042 ENCARTA WORLD ENGLISH DICTIONARY (1999) (defining "life-threatening" as "very dangerous or serious with the possibility of death as an outcome"); 1306 WEBSTER'S THIRD NEW INT'L DICTIONARY (1981) (hereinafter "WEBSTER'S")(defining "life" as "the earthly state of human existence"); 2382 WEBSTER'S (defining "threatening" as "indicat[ing] as impending"); and 1164 WEBSTER'S (defining "injury" as "hurt, damage, or loss sustained"). Consequently, it was not necessary for the legislature to define the term "life-threatening injury" in order to give fair notice to motorists that the act of driving a motor vehicle while intoxicated or under the influence of alcohol would constitute a violation of former § 388B if the act resulted in an injury to another person that could cause that person's death.[3] The meaning of the term, moreover, was sufficiently clear to permit police, judicial officers, and triers of fact to enforce the statute.

---

**3.** The underlying prohibited conduct—driving a motor vehicle while intoxicated or under the influence of alcohol—was prohibited by a separate statute long before § 388B of Article 27 was enacted. *See* former Md.Code (1977, 1999 Repl.Vol.), § 21–902 of the Transp. Art. Former Article 27, § 388B merely created an additional offense that would apply in situations where the prohibited conduct caused the specific injury in question. Former § 338A of Article 27 set forth the related offense of homicide by motor vehicle while intoxicated or under the influence of alcohol. *See* Md.Code (1957, 1996 Repl.Vol., 2000 Cum.Supp.), § 388A of Art. 27 (now Md.Code (2002, 2004 Cum.Supp.), C.L. §§ 2–503 and 2–504).

## II.

## Trial Court's Application of Law

 Todd argues that, even if the term "life-threatening injury," as used in § 388B, is not unconstitutionally vague, the trial court erred by "failing to strictly construe the term and instead applying a broad interpretation of 'life[-]threatening injury' to the facts before [it]." Todd points out that the rule of lenity requires that an ambiguous penal statute be construed in the light most favorable to the defendant. *See generally Webster v. State*, 359 Md. 465, 481, 754 A.2d 1004 (2000). Todd asserts that the term "life-threatening injury" is ambiguous and therefore should have been interpreted to mean an injury involving "a high probability of imminent death." He complains that the court "interpreted 'life[-]threatening injury' broadly, to include injuries that created the mere 'potential' for death." Todd's argument is without merit.

The record reflects that Todd was charged with causing life-threatening injuries by motor vehicle, while intoxicated and while under the influence of alcohol, not only to Sarah Vance but also to her father, James Vance. Todd's counsel moved for judgment of acquittal at the close of the State's case, asserting that the statute's "lack of definitiveness" as to the meaning of "life-threatening injury" rendered § 388B of Article 27 void for vagueness. The court responded: "I think that when they don't have a definition, we are to employ our common sense and everyday experiences."

The trial court asked the prosecutor if there was "anything that would indicate that the injuries to [James Vance] were life threatening." The prosecutor stated:

> Only the sense that the seriousness of the injuries to the leg, for some reason I thought that the wound to the leg was protruding and I guess until Mr. Vance set me straight on the stand, other than the fact that he was pinned in, his . . . ankles and leg were broken, I don't recall anything specific in the records that would be anything, but certainly the fact that he was injured, given the extent of the injury, I think

they could be considered life-threatening. But of course the help was there fairly quickly.

The court then granted the motion for judgment of acquittal as to the counts naming James Vance as the victim, stating:

Well, I have to say I think he had serious injuries, and there is no dispute about that as far as I've heard thus far. And in all serious automobile accidents the potential is there for death. But in this case I believe that I'm required by my review of the statute, and I have to, that life threatening injuries is not defined anywhere, wouldn't that have been a helpful thought for the legislature to add, but just common sense would mean that *injuries from which you could directly infer a potential death. ...*

\* \* \*

And I can't find that [as to James Vance] from this set of facts. I can find very serious injuries.

As to Sarah it's a different ball game because I think any time you have serious brain injuries, we go into emergency treatment for those kinds of injuries, there was, and obviously by virtue of the fact that the treatment that was rendered to her on the basis that it was, that she did suffer life-threatening injuries, and I think that's a fair inference that can be drawn from the testimony and the evidence.

(Emphasis added.) The court did not address the matter further when it announced its verdicts at the close of the case.

██ For the same reasons that the term was not void for vagueness, it was not ambiguous. Although "life-threatening injury" was not defined in former § 388B, and although the trial court indicated that such a definition would have been "helpful," the court correctly indicated that the definition could readily be established through "common sense and everyday experience." As we have indicated, by common parlance a life-threatening injury is one that is "potentially fatal," 23 CONCISE OXFORD ENGLISH DICTIONARY, *supra*, in that it is "very dangerous or serious with the possibility of death as an outcome." 1042 ENCARTA WORLD ENGLISH DICTIONARY, *supra*.

It is obvious, from the trial court's explanation of its reason for granting judgment of acquittal as to the counts involving James Vance, that the trial court did not view a "life-threatening injury" as one in which the possibility of death was attenuated or remote. The trial court expressly determined that the injuries to James Vance, although "very serious," were not likely to cause his death. It explained that the head injuries suffered by Sarah were life-threatening; the injuries suffered by James Vance to his ankles and leg were not.

## III.

### Sufficiency of the Evidence

■ Finally, Todd argues that the evidence was insufficient to support his convictions for causing a life-threatening injury by motor vehicle while intoxicated and causing a life-threatening injury by motor vehicle while under the influence of alcohol. He bases his argument on the fact that no expert medical witness expressly testified that the injuries to Sarah were life-threatening.

■ It is true that, "[w]hen a complicated issue of medical causation arises, expert testimony is almost always required." *Giant Food, Inc. v. Booker,* 152 Md.App. 166, 178, 831 A.2d 481 (2003) (regarding workers' compensation claim alleging employee's asthma was due to exposure to freon gas at workplace), *cert. denied,* 378 Md. 614, 837 A.2d 926 (2003). "Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue...." Md. Rule 5–702. The trial court apparently did not believe that expert medical testimony was necessary to its determination as to whether Sarah's injury was life-threatening, and we perceive no error.

"Upon appellate review[,] the 'applicable standard is whether after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Galloway,* 365 Md. at 649, 781 A.2d 851 (citation omitted).

"Our concern, therefore, is not whether the verdict was in accord with the weight of the evidence but rather, whether there was sufficient evidence produced at trial 'that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt.' "

*Id.* (citations omitted).

As we summarized in our statement of the relevant facts, the State presented evidence that Sarah suffered a deep gash across her forehead that bled profusely and caused her to lose consciousness. Portions of her face were "completely crushed" in the accident. She was rushed to Peninsula Regional Medical Center, where physicians diagnosed bleeding on the brain. Hospital records that were admitted into evidence reflect that the emergency room physician determined that Sarah had suffered "severe cranial injury" and was in need of emergency surgery to repair it. Physicians at Peninsula attempted to stabilize Sarah's condition so that emergency surgery could be performed on her skull. The physicians were unable to stabilize her, however, and could perform no more surgery than that which was necessary to control the bleeding. The next day, when Sarah's condition was more stable, she was flown to Johns Hopkins Hospital, where a surgical team was waiting to perform more surgery to repair Sarah's head wound and to stop the bleeding on her brain. Sarah was later required to undergo several more surgeries as well.

We are convinced that, on this evidence, a rational trier of fact could have concluded beyond a reasonable doubt that Sarah's injury was of such a nature that, but for the intervening medical attention, she would have died. No expert medical testimony was necessary to establish that Sarah suffered a life-threatening injury.

**JUDGMENT AFFIRMED.**

**COST TO BE PAID BY APPELLANT.**